IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

YVONNE M. DEMARCE                                                    PLAINTIFF

V.                                           CIVIL ACTION NO.: 2:12-CV-34-SA-SAA

ROBINSON PROPERTY GROUP
CORPORATION                                                         DEFENDANT

MEMORANDUM OPINION GRANTING SUMMARY JUDGMENT

Presently before the Court are Defendant's Motion for Summary Judgment [54], Defendant's Unopposed Motion for Leave to File Excess Pages [62][1], Defendant's Motion to Strike [63], and Plaintiff's Motion to Amend or Correct [66].  After reviewing the motions, responses, and applicable legal authority, the Court finds that summary judgment is appropriate.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Yvonne Demarce began employment with the Robinson Property Group in July of 2000 as a dealer at the Horseshoe Casino located in Tunica, Mississippi.  Throughout her employment with Defendant, Plaintiff received warnings for excessive absences on several occasions.  During the pertinent time period, Horseshoe's attendance policy was based on a ten point system whereby employees received points for a number of activities, including work absences, arriving to work late, or leaving early.   Under the attendance system, employees who desired to be the first to leave on a particular day could sign the early out (EO) list.  Thus, if business slowed, they would be the first sent home.  If, however, an employee failed to sign the list, but nonetheless left work early, the employee would be given a point for circumventing, or

---

[1] Based on the lack of opposition to Defendant's Motion for Leave to File Excess Pages [62], that motion is GRANTED.

bypassing, the EO list. Demarce received warnings based on her attendance patterns in 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2010.

In 2008, Demarce began to complain to management about the difficulty of performing her job due to back pain. According to Demarce, who suffers from osteoarthritis, she eventually informed her supervisor, "because of my arthritis and that getting so bad, it's pushing on my sciatic nerve which is making my knees and hips go numb and give out on me standing and at times I would even get dizzy." Demarce therefore asked Renee Suhr, who was in charge of assigning dealers to specific tables, if she could work a sit-down table. Suhr informed Demarce that she would have to return with a note from a healthcare provider.

In May of 2008, Demarce was approved for intermittent or non-continuous FMLA leave from May 28, 2008 to May 28, 2009, due to her arthritis and COPD. In July of 2008, Demarce was informed that her FMLA leave had been erroneously granted since she had not worked the required 1250 hours in the previous twelve months. Demarce's hourly requirement was calculated on a rolling calendar basis. On May 21, 2009, Demarce again requested FMLA leave but was denied because she again failed to meet the minimal hourly requirements. She then applied for intermittent FMLA leave for a third time on July 31 2009. On August 6, 2009, Robinson approved that request for leave until July 6, 2010.

Demarce began a regimen of physical therapy, but failed to achieve any improvement in her arthritic condition. On October 16, 2009, Demarce returned with a note from her healthcare provider indicating that she could no longer stand while working due to her osteoarthritis. Lisa Kinard, the leave of absence administrator, requested additional information from Demarce's healthcare provider but reassigned her to sit-down work while the request was pending. The Casino had four sit-down games: a blackjack derivative game called "21 plus 3," three card

poker, and two mini baccarat tables. At the time, Plaintiff knew how to deal "21 plus 3" and three card poker. Demarce, who had initially dealt blackjack, was assigned to deal at the "21 plus 3" table.

On October 23, 2009, Dr. James Varner filled out the request for supplemental clarification and returned it to Horseshoe, indicating that Demarce needed an accommodation for two to four weeks. On November 11, 2009, Kinard requested additional information regarding Demarce's need for accommodation. On January 22, 2010, Varner responded to the request, stating that Demarce could only perform seated work and that the limitation would span an indefinite period of time. That note, however, also indicated that she could not perform standing work beyond eight hours. Viewing the limitations as inconsistent, Kinard requested clarification. Varner then sent another note with the prolonged standing limitation eliminated.

On February 17, 2010, Defendant approved Plaintiff's request for an indefinite accommodation. According to that letter, Demarce was "approved for 'sit down' games only." However, the letter further articulated that "[w]hen the 'sit down' game has closed, you will have to leave under FMLA or take a regular 'stand up' game." Further, it reiterated that "[y]our FMLA EO's *will* count against your available FMLA." (emphasis in original). The parties proceeded under the agreement for several months without incident. On July 9, 2010, Plaintiff again requested FMLA intermittent leave for her own health. At the time, Plaintiff was not an eligible employee under the FMLA, and her request was therefore denied.

Additionally, because Plaintiff's "21 plus 3" table was located in Pit 4 of the Casino, it was regularly closed when business slowed. Accordingly, Plaintiff began to both work fewer hours and accumulate points for circumventing the EO list. According to Plaintiff, she did not want to sign the EO list for fear of not being able to work sufficient hours to qualify for FMLA

leave. On the other hand, she could not work a stand up game following the closure of her sit-down table and did not want to accumulate points for circumventing the EO list. Plaintiff discussed the possibility of learning to deal mini-baccarat, which was located in a continuously operated pit, but never became qualified to do so. On July 8, 2011, Plaintiff was terminated for accruing 10.5 attendance points in the preceding twelve month period. Of those, 8 points were accrued for calling out from work, while 2.5 were related to circumventing the EO list.

Plaintiff subsequently filed the present action, alleging intentional discrimination under the Americans with Disabilities Act (ADA), failure to accommodate under the ADA, FMLA interference, and FMLA retaliation. Defendant seeks summary judgment as to all of Plaintiff's claims.

SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when the evidence reveals both that there is no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In

reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

## DISCUSSION AND ANALYSIS

### *Disability Discrimination*

The ADA prohibits discrimination on the basis of an employee's disability. Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures . . . discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To sustain a claim for disability discrimination, a plaintiff must establish that she: (1) has a disability; (2) is qualified for the position in which she was employed; and (3) was discriminated against because of her disability. Griffin v. UPS, 661 F.3d 216, 222 (5th Cir. 2011); Jenkins v. Cleco Power, 487 F.3d 309, 315 (5th Cir. 2007).

Where, as here, the plaintiff produces no direct evidence of discrimination, but instead relies on circumstantial evidence to sustain her case, the Court applies the familiar McDonnell Douglas burden-shifting framework to determine whether she can meet such a standard. Daigle v. Liberty Life Ins. Co., 70 F.3d 394, 396 (5th Cir. 1995). Under that analysis, the plaintiff must

show that she: "1) suffers from a disability; 2) was qualified for the job; 3) was subject to an adverse employment action; and 4) was replaced by a non-disabled person or was treated less favorably than non-disabled employees." Owens v. Calhoun Co. Sch. Dist., --- F. App'x ---, 2013 WL 5530578, *2 (5th Cir. Oct. 8, 2013) (citing Daigle, 70 F.3d at 396)). If the plaintiff successfully establishes such a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. McInnis v. Alamo Cmty. Coll. Dist., 207 F.3d 276, 279 (5th Cir. 2000). If the employer is able to do so, the burden then shifts back to the plaintiff to show that the proffered reason was merely pretext. Id.

In the case at hand, Defendant challenges only the second and fourth prongs of Demarce's prima facie case. That is, Robinson contests Demarce's ability to establish that she was a qualified individual and that she was replaced by a non-disabled person or was treated less favorably than non-disabled employees.

"[Under the ADA,] it is the employee's burden to prove that he is a qualified individual with a disability . . . ." Rizzo v. Children's World Learning Ctrs., Inc., 213 F.3d 209, 218 (5th Cir. 2000). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A plaintiff must show either that "(1) she could perform the essential functions of the job in spite of her disability, or (2) that a reasonable accommodation of her disability would have enabled her to perform the essential functions of the job." Burch v. City of Nacogdoches, 174 F.3d 615, 619 (5th Cir. 1999); see Appel v. Inspire Pharms., Inc., 428 F. App'x 279, 284 (5th Cir. 2011) ("An employee who cannot perform essential job requirements, even with accommodation, is not a qualified person with a disability.").

Robinson contends that Demarce was not a "qualified individual" because she could not perform the "essential functions" of the job. Specifically, Robinson argues that regular attendance was an essential function of the job, and that Demarce simply could not fulfill that requirement. In support of that contention, Robinson points to the Fifth Circuit's decision in Hypes v. First Commerce Corp., 134 F.3d 721, 727 (5th Cir. 1998). There, the plaintiff was employed as a loan review analyst. Id. at 724. From the inception of plaintiff's employment with defendant, he suffered from a pattern of absenteeism and tardiness, leading to reassignment within the company. Id. Following that reassignment, plaintiff continued to struggle with attendance before being diagnosed with chronic obstructive lung disease. Id. Once diagnosed, plaintiff's physician informed defendant that plaintiff would be required to miss work on a short-term basis for testing and treatment, but that the restrictions on plaintiff's ability to work would be temporary in nature. Id. Following plaintiff's treatment, his physician indicated that plaintiff was able to return to full activity without any restrictions. Id.

Upon his return to work, plaintiff's supervisor informed him that he would be expected to be at work on time and that any medically related absences would require proper documentation. Id. Plaintiff immediately informed his supervisor that he was afraid that his condition would make it difficult to arrive by 8:30 a.m. for work and that he would be unable to wear a neck tie. Id. He requested that he be able to start work later in the morning and forego wearing a tie. Id. That request, which was unsupported by a medical recommendation, was denied. Id. Plaintiff subsequently returned with a physician's recommendation that hypothesized that travel would be difficult for plaintiff, but still failed to identify any limitations regarding plaintiff's ability to work generally and to arrive punctually. Id. at 725. Nonetheless, over the course of the next two

and a half months, plaintiff missed nine full days and seventeen half days and was eventually terminated.  Id.

In affirming the district court's grant of summary judgment, the Fifth Circuit held that the plaintiff was not "otherwise qualified" for the position because "it was an essential function of his job, as a member of a team, that [plaintiff] be in the office, regularly, as near to normal business hours as possible, and that he work a full schedule."  Id. at 726.  Based on plaintiff's excessive absenteeism, the court found that plaintiff "could not arrive at work early enough or often enough" to perform the job's essential functions.  Id.  Further, his physician indicated only one limitation resulting from his disability: the inability to travel.  Id. at 727.  Although plaintiff informed his employer that he would not be able to arrive at work in a timely manner, he did not suggest an accommodation that would ameliorate that difficulty.  Id.  Perhaps most significantly, even had the employer placed plaintiff on a flex time schedule and allowed him to arrive one or two hours later in the morning, such an accommodation would not have solved the problem of consistently arriving four hours late and missing entire days.  Id.  Thus, the court concluded that plaintiff was not "otherwise qualified."  Id.

In the case at hand, Robinson contends that Demarce was similarly not "otherwise qualified" and draws much attention to Plaintiff's pattern of tardiness and absenteeism.  Under the present set of facts, however, Defendant employs a detailed and formulaic attendance policy. According to the Horseshoe Employee Handbook, "[t]he [a]ttendance policy is based on a 10-point system.  Points are accumulated when an employee is late, leaves early, is absent from work and/or fails to call-in within three (3) hours after the start of his/her scheduled shift." Among other enumerated events, points are not accumulated for "[t]ime off due to discipline" or "[b]usiness demand early outs."   Additionally, "[a]n employee can reduce his/her point total on

the 12-month anniversary of an incident; that is, the point(s) for the incident drop off and are no longer counted." "A total of 10 points in any 12-month period," however, "results in Separation of Employment."

In the case of Demarce, after calling out on July 8, 2011, her "employment was terminated for accruing 10.5 attendance points which exceeded the maximum of 10 points allowed under the attendance policy." Demarce, however, asserts that she did not have an attendance problem, but instead had an accommodation problem. Under the accommodation plan approved by Horseshoe, Demarce was approved for "sit down" games only. When such sit down games were closed, however, Plaintiff was informed that she would have to take leave under FMLA or work a regular "stand up" game.

Plaintiff's table was located in Pit 4 of the Casino floor. Unlike Pit 1, Pit 4 did not always stay open and was closed in accordance with business demands. When Pit 4 was closed early for lack of business, Demarce could either deal a stand up game or use an FMLA absence. According to the uncontested facts before the Court, however, Demarce's medical condition rendered her unable to deal a stand up game for any extended period of time. Further, by the tail end of Demarce's employment with Defendant, she was no longer eligible for FMLA leave. Thus, Demarce began to periodically accumulate points when Pit 4 was closed. According to Defendant, "[o]f the 10.5 points leading to Plaintiff's termination, only 2.5 points were due to her circumventing the EO list." Nonetheless, those 2.5 points pushed Demarce across the ten point threshold, leading to her termination.

Defendant does not contend that Plaintiff's requested accommodations would not have at least partially ameliorated Demarce's attendance problems, but instead argues that they were not reasonable. The reasonableness requirement of Plaintiff's proposed accommodations is an

essential element of her prima facie case, and Demarce thus bears the burden of proof on that prong. Riel v. Elec. Data Sys. Corp., 99 F.3d 678, 683 (5th Cir. 1996). Notably, however, "a reasonable accommodation is 'a method of accommodation that is *reasonable in the run of cases*, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular employer's operations.'" Id. (emphasis added). In assessing whether such an accommodation poses an undue hardship, the Defendant bears the burden and the court should consider factors such as: "the nature and the cost of the accommodation, the size of the facility and the business entity involved in terms of financial resources, personnel, and geography; and the type of operations including composition, structure and function." Id. at 682 (internal quotations omitted).

In the case at hand, Plaintiff proposed at least two specific accommodations. First, Demarce approached her shift supervisors and inquired, "is there any way we could move one of the sit-down tables over to [P]it 1 because [P]it 1 never closes, and then I wouldn't be forced to go home." Further, she stated, "that would not only accommodate a handicap dealer but handicap players if you kept a sit-down game open 24/7." Second, according to her deposition testimony, she also inquired, "what is the difference between me and the dealers that you force out? You force them out when you don't have a place to put them and they don't get pointed. They don't get their FMLA taken away. They don't get their points counted against their time worked."

Again, Defendant does not dispute that either of these accommodations, if granted, would have assuaged Plaintiff's attendance problems and therefore allowed her to perform the essential functions of the job. For present purposes, the Court finds that there is a genuine dispute of material fact as to whether the requested accommodations would have been reasonable "in the

run of cases." See id. Unlike Hypes, Plaintiff's requested accommodations, if granted, would have prevented her from crossing the 10 point threshold and thus being immediately terminated. See 134 F.3d at 727 ("Since regular attendance is an essential function of [plaintiff's] job, and since he could not be expected to have regular attendance even with the requested flex-time accommodation, [plaintiff] is not 'otherwise qualified'").

Assuming then for present purposes that Demarce is an otherwise qualified individual, she must still be able to establish the fourth prong of her prima facie case; that is, that she was replaced by a non-disabled person or was treated less favorably than non-disabled employees. Daigle, 70 F.3d at 396. Plaintiff, however, does very little to bolster her case in regard to the fourth prong. In one paragraph, Plaintiff contends that she was eventually replaced by Bryan Jenkins and Ryan Seibert, and that "Defendant has produced no evidence that either Jenkins or Siebert had a disability, nor that either required any accommodation under the ADA." Plaintiff misunderstands the nature of the burden at the current stage of litigation. In order to establish a prima facie case, it is Plaintiff's burden to show that she was replaced by someone outside of her protected class. Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507, 513 (5th Cir. 2001); Paye v. Sec. of Def., 157 F. App'x 234, 236 (11th Cir. 2005) ("[Plaintiff] should only have been required to show that she was replaced by someone outside her class. It does not matter, [however], because she has not shown—with evidence, instead of assertions—a genuine issue as to either component . . . . she failed to offer any evidence about the race of her replacement."). Quite simply, Demarce has failed in this regard. She has offered no evidence regarding whether either of her potential replacements were members of her protected class.

Alternatively, however, Demarce also attempts to meet her prima facie showing by alleging that she was treated less favorably than non-disabled employees. Under this disparate

treatment avenue, Demarce must establish a genuine dispute of material fact regarding whether she was treated less favorably than similarly situated employees outside the protected class. See Lee v. Kansas City S. Ry., 574 F.3d 253, 259 (5th Cir. 2009). In order to do so, she must show that "employees who were not members of the plaintiff's protected class were treated differently under circumstances nearly identical to [hers]." Turner v. Kansas City So. Ry. Co., 675 F.3d 887, 893 (5th Cir. 2012) (internal quotations omitted). As a general matter, employees with different supervisors, who work for different divisions of a company, or who were subject to an employment decision too remote in time will not be deemed comparable for purposes of the similarly situated analysis. Lee, 547 F.3d at 259. Because no presumption of discrimination is raised if legitimate substantive differences between the plaintiff and proffered comparator adequately explain the disparate treatment, the plaintiff is generally required to point to a similarly situated employee outside of the protected class who was in "nearly identical" circumstances. See Bryant v. Compass Group USA Inc., 413 F.3d 471, 478 (5th Cir. 2005); Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 221 (5th Cir. 2001); Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 304-05 (5th Cir. 2000) (requiring "nearly identical" comparator under ADEA analysis).

Specifically, Demarce contends that "[w]hen non-disabled dealers' tables were closed and they were sent home, because of no fault of their own, they did not have to use their FMLA leave, and were not assessed attendance points." Notably, Plaintiff fails to point to any specific non-disabled employees who did not receive points when sent home for business reasons, but instead cites the testimony of several casino supervisors who generally testified that employees did not receive attendance points when a downturn in business required the Defendant to send employees home. For instance, when asked whether he was aware of anyone else who was

required to use FMLA when his or her game was closed, supervisor Kevin Munn indicated that he was not. Additionally, based on its own review, the Court takes note of the fact that the Employee Handbook articulates that employees would not receive points when leaving early "due to business demands."

Nonetheless, Plaintiff's attempt to consolidate these factually distinct scenarios as one in the same proves difficult under the rigorous comparator analysis required by the court. Based on the undisputed facts before the Court, it is clear that Defendant would, with some degree of regularity, close Plaintiff's pit before the end of the shift based on a downturn of business. Because Plaintiff lacked the training necessary to work any of the casino's other sit down games which remained open and could not work a stand up game, she was compelled to leave her shift early. Notably, however, Plaintiff provides no testimony regarding the treatment received by other specific non-disabled employees who similarly worked her pit. Plaintiff has failed to specifically point to any similarly situated employees outside the protected class who were sent home at the close of Pit 4. Plaintiff leaves unanswered, for instance, whether those displaced non-disabled workers were also sent home at the same time as Plaintiff or whether they were reassigned to other duties within the Casino for the remainder of the shift. As such, without a more detailed comparator analysis, the Court is dubious that such evidence reveals that discriminatory animus, rather than substantive differences, account for the differential treatment. See, e.g., Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995) (requiring nearly identical circumstances and finding that lack of evidence regarding comparators' disciplinary records affected comparability between the two); Dortch v. Mem. Herman Healthcare Sys. Sw., 525 F. Supp. 2d 849, 864 (S.D. Tex. 2007) (noting that "[t]aking extended breaks is not 'nearly identical' to failing to report to, or 'call in sick' from, a scheduled work shift."). Nonetheless,

because Plaintiff does cite Munn's sworn statement that he was unaware of anyone else who was required to use FMLA "when their game was closed," the Court assumes, without deciding, that Plaintiff can satisfy the fourth prong of her prima facie case.  Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 41 (5th Cir. 1996)  (articulating that in order to establish a prima facie case, "plaintiff need only make a very minimal showing.").

Even assuming, however, that Plaintiff could raise a prima facie case, her discrimination claim still fails to advance beyond summary judgment.  Again, Defendant argues that Plaintiff was terminated because she accumulated 10.5 attendance points in a twelve month period. Under the Horseshoe attendance policy, "A total of 10 points in any 12-month period results in Separation of Employment."  Because Defendant has successfully shown the ability to put forward a legitimate, non-discriminatory reason for Plaintiff's termination, the burden then shifts back to Demarce to show that the proffered reason was merely pretext.

Pretext may be established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'"  Deanes v. N. Miss. State Hosp., — F. App'x—, 2013 WL 5647126, at *5 (5th Cir. 2013)  (quoting Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003)).   In assessing that showing, the question before the Court is whether Plaintiff has produced "sufficient evidence from which a jury [can] conclude that [Defendant] did make its employment decision based on [Plaintiff's] status as disabled despite [Defendant's] proffered explanation."  Raytheon Co. v. Hernandez, 540 U.S. 44, 54, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003).  In order to do so, Plaintiff must cite "substantial evidence" showing that the proffered reason was a pretext for discrimination.  Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400, 403 (5th Cir. 2001); Bauer v. Albemarle Corp., 169 F.3d 962, 967 (5th Cir. 1999)  (noting that "a mere shadow of a doubt is insufficient.").   Significantly, that

14

substantial evidence "must do more than merely show that [Defendant] was mistaken in firing her, even by its own terms; she must establish that [Defendant] fired her on account of [her protected status]." Deanes, 2013 WL 5647126 at *4 (citing LaMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 391 (5th Cir. 2007)).

In support of her pretext argument, Demarce offers several unpersuasive theories. First, she argues that "Horseshoe accommodated numerous other dealers when they had disabilities and needed accommodation. None of those employees had to jump through the certification process which Demarce was subjected to." This may prove unfair treatment, but not discriminatory treatment. It does nothing to impugn Defendant's proffered reason for the termination. If anything, it tends to rebut Demarce's theory that Defendant discriminated on the basis of her disability and its unwillingness to provide an accommodation. See Gobert v. Saitech, Inc., 439 F. App'x 304, 306 (5th Cir. 2011) (observing in the context of a race discrimination claim that positive reviews of employee's performance instead showed that employer did not harbor animus toward plaintiff on account of his race).

Demarce's second attempt to paint Defendant's proffered justification as pretext turns on her theory that one of her attendance points was unjustly awarded. Specifically, Demarce takes issue with an attendance point awarded October 22, 2010. On that day, Plaintiff contends that she was "assessed a point and sent home . . . because she had to wear a heart monitor and could not button her shirt." According to Plaintiff, "[t]his was discriminatory since there are other non-disabled dealers who do not button their shirts, or committed other violations of the dress code." Plaintiff's construction of the incident, however, is not supported by the facts before the Court.

Based on Demarce's sworn testimony, after she was released from a hospital stay in 2010, she was instructed to wear a heart monitor for thirty days. Demarce recalls that the

monitor arrived "right before [she] was leaving for work." According to her, "I was in my uniform ready—getting ready to go to work. I'm reading the instructions, and it is to be worn around your neck. . . . [a]nd there was no way I could button the top button." Because Horseshoe requires all employees to button the top button of their tuxedo shirt, Demarce approached her shift boss and informed her, "just to let you know, I'm wearing this new heart monitor they sent me, it goes around my neck, and so I'm not going to be able to button this top button." Demarce's shift boss, however, instructed her to go to the wardrobe department and have them move the button over to allow her to button the shirt over the monitor.

According to Demarce, the proposed trip to the wardrobe department was impractical and would have been futile anyway. Not only did she not have time to go to wardrobe and make it back in time for her shift, but she had already had the button moved over as far as possible and any larger shirt wardrobe might have been able to provide her would have been baggy elsewhere. Accordingly, Demarce attempted to keep the shirt buttoned, but was unable to do so. She recalled the incident as follows: "I could not breathe. I mean, even my players were saying, what is wrong, what is wrong? Because I'm trying to pull my collar out because I could not get it—I have COPD in my bronchial tubes, and I could not get a breath and with that as tight as it was. And I was in tears, and I went home." Accordingly, Demarce was given one point for wearing an inappropriate uniform.[2]

This incident, however, does nothing to rebut Horseshoe's tendered legitimate, nondiscriminatory explanation for Demarce's termination. Although Demarce contests the fairness of the point, she does not contest that the Horseshoe uniform policy required that she

---

[2] Although Defendant's records indicate the point was given for circumventing the EO list, Demarce insists the point was given for her uniform infraction and contends "the last paperwork I got from them says because of inappropriate uniform."

16

button her top button. In fact, Demarce admits that she brought it to the attention of her shift boss because she knew that she was not in compliance with the policy. Despite the fact that she contends that other employees were able to get away with uniform infractions at times, Demarce's burden at the pretext stage requires that "she must establish that [Defendant] fired her on account of [her protected status]." Deanes, 2013 WL 5647126 at *4. Demarce's heart monitor, and her inability to button the top button of her uniform on October 22, 2010, have no relation to her inability to perform standing work. Plaintiff has repeatedly averred that her limitation was the inability to stand. See Pl.'s Sec. Am. Compl. ¶¶ 6,7 (averring that "Defendant would not reasonably accommodate Plaintiff's disability, the inability to stand" and Defendant "refused Plaintiff's reasonable accommodation for Plaintiff's disability, which was her inability to stand."); Pl's Br. Summ. J. 21 ("What Demarce was unable to do was work while standing . . ."); Taylor v. Principal Fin. Grp. Inc., 93 F.3d 155, 164 (5th Cir. 1996) (noting that "the ADA requires employers to reasonably accommodate limitations, not disabilities."). As such, the incident fails to support her pretext argument.

Finally, Demarce additionally points to an incident occurring June 4, 2011. On that date, Demarce "was sent home because another dealer was not feeling well and needed the sit-down table." Although Demarce's supervisor initially agreed that the early leave should be recorded as a force out, it was later changed to an early out and Demarce was subsequently allocated a half-point penalty. Even had this incident not been recorded, however, Demarce would still have accumulated 10 points within the preceding 12 months and would have been terminated. Accordingly, the incident does nothing to establish that [Defendant] fired her on account of [her protected status]." Deanes, 2013 WL 5647126 at *4.

Based on the foregoing, the Court finds that summary judgment is due in favor of Defendant as to Plaintiff's intentional discrimination claim based on her inability to establish that Defendant's proffered legitimate, non-discriminatory reason for the termination was merely pretext for discrimination. Accordingly, Plaintiff's ADA discrimination claim is due to be dismissed.

*Failure to Accommodate*

In addition, however, Plaintiff also brings a discrete failure to accommodate claim. <u>See</u> <u>Windhauser v. Bd. of Supervisors</u>, 360 F. App'x 562, 565 (5th Cir. 2010) (noting that a failure to accommodate claim is distinct). Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "An employee who needs an accommodation because of a disability has the responsibility of informing her employer." <u>EEOC v. Chevron</u> <u>Phillips Chem. Co., LP</u>, 570 F.3d 606, 621 (5th Cir. 2009). The Fifth Circuit has recognized that "'where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.'" <u>Id.</u> (quoting <u>Taylor.</u>, 93 F.3d at 165).

Once the employee makes such a request, however, "the employer is obligated by law to engage in an 'interactive process': 'a meaningful dialogue with the employee to find the best means of accommodating that disability.'" <u>Chevron Phillips</u>, 570 F.3d at 621 (quoting <u>Tobin v.</u> <u>Liberty Mut. Ins. Co.</u>, 433 F.3d 100, 108 (1st Cir. 2005)). Put another way, "[w]hen a qualified

individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." EEOC v. Agro Distrib., 555 F.3d 462, 471 (5th Cir. 2009). "When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodation." Chevron Phillips, 570 F.3d at 621 (internal citation omitted).

Notably, however, "[t]he ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." Id. "A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously." Jenkins v. Cleco Power, 487 F.3d 309, 316 (5th Cir. 2007). "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." Id. at 315.

Thus, to prevail on a claim of discrimination based on failure to accommodate a disability, the plaintiff must show that (1) the plaintiff is a "qualified individual with a disability;" (2) the disability and its consequential limitations were "known" by the covered employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations. Feist v. State of Louisiana, 730 F.3d 450, 453 (5th Cir. 2013). Defendant here argues both that Plaintiff's proposed accommodations were not reasonable and would have imposed an undue hardship. For the reasons set forth previously, the Court again determines that there is a genuine dispute of material fact as to whether Plaintiff's requested accommodations were reasonable "in the run of cases." And, although, Defendant further alleges that such requests would have imposed an undue hardship, Robinson provides no evidence in support of that affirmative defense, and the Court therefore rejects it. Riel, 99 F.3d at 684.

In addition to challenging the reasonableness of Plaintiff's proposed accommodations, however, Robinson also contends that since there were other reasonable accommodations available to Demarce, which she did not take advantage of, she cannot now be heard to complain that Robinson failed to provide her preferred reasonable accommodation. In support of that argument, Robinson points the Court to Bielski v. Green, 674 F. Supp. 2d 414, 424 (W.D.N.Y. 2009). In that case, the District Court for the Western District of New York held that "if the employer has proposed a reasonable accommodation, the employee cannot insist on some other particular accommodation, even if the employee's proposed accommodation is also reasonable." Id. Thus, that court concluded that "if the evidence shows conclusively that the employer offered a reasonable accommodation, then the employer is entitled to summary judgment." Id. at 424.

Similarly, the Sixth Circuit has articulated that "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." Hankins v. Gap, Inc., 84 F.3d 797, 800-01 (6th Cir. 1996). Although the Fifth Circuit has not yet had the occasion to consider that precise question, the court has remained ardent that "[t]he ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." Agro Distrib., 555 F.3d at 471. Additionally, "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the informal, interactive process is traceable to the employee and not the employer." Griffin, 661 F.3d at 224 (quoting Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir. 1999)).

In the case at bar, it is undisputed that although there was not a "21 plus 3" sit-down game located in the continuously operated section of Pit 1, there was a mini-baccarat game located there. According to Demarce, she herself contemplated the fact that learning to deal mini-baccarat would enable her to work a sit-down table without accumulating attendance points

or being forced to leave early.[3]  Based on her testimony, Demarce even began the process of attempting to qualify to deal the game.  In her deposition, Demarce recalled, "another time, I got tapped off my game, and there was maybe an hour or so to go left to my shift."  Linda Long, who was supervising the floor, said, "Yvonne, I really hate the fact that they're making you use your FMLA to go home . . . is there any—she said, do you know [mini-baccarat]?"  Long then explained, "Because [mini-baccarat] is another sit-down table."  Demarce, however, responded, "you know what Linda, . . . I don't.  I've never dealt the game."  Long, though, arranged for Plaintiff to shadow the dealer in order to begin learning another game.  According to Demarce, she received extremely positive reviews from both the dealer and customers and desired to continue training.

Thus, the next night, Demarce approached the on-duty floor supervisors about the possibility of shadowing the mini-baccarat dealer once her table closed for the night.  As Demarce recollects, however, they informed Plaintiff that shadowing was considered training, and she could not do so while still on the clock.  They further conveyed to Demarce, however, that "*if you want to learn it, you come in on your days off.*"  (emphasis added).  Nonetheless, because Demarce already knew the basics of the game and perceived that some people were allowed to shadow on the clock, she refused to pursue further training.[4]

---

[3] Although portions of Demarce's testimony indicate that pai gow was the alternative game she contemplated learning, she later clarified, "Did I say pai gow? . . . I meant mini bac.  Pai gow is stand up."

[4] According to Plaintiff's supervisor Laura Gragg, as general policy, the Casino did not allow shadowing.  In her words, "I've never done it here in sixteen-and-a-half years."  Similarly, supervisor Raymond Lundsford also testified that the Casino did not allow employees to shadow while on the clock.  Although Demarce contends that shadowing did occur at the Casino, she cites no admissible evidence in support of that contention and does not contend that employees did so while on the clock.  See Little, 37 F.3d at 1076 (holding that a dispute of material fact is not created by metaphysical doubt, conclusory allegations, or unsubstantiated assertions.).  Moreover, Demarce admits that she is unaware of whether anyone had ever shadowed for mini-

Based on the uncontested record before the Court, then, learning to deal mini-baccarat would have allowed Demarce the opportunity to continue working through her full shift without exhausting her FMLA leave or attributing attendance points. Further, Plaintiff's supervisor plainly informed her that she could become qualified as a dealer for the game if she was willing to come in for training on her days off. Significantly, "the responsibility for fashioning a reasonable accommodation is shared between the employee and the employer." Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir. 1999) (internal quotation omitted). Here, however, Plaintiff decided not to further pursue that additional option, and, accordingly, the "responsibility for the breakdown of the informal, interactive process is traceable to the employee and not the employer." Griffin, 661 F.3d at 224 (internal quotation omitted).

Additionally, Demarce does not contest that the accommodation would have alleviated her attendance problems and admits that the qualification process was available to her. Under Fifth Circuit precedent, "[t]he ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." Agro Distrib., 555 F.3d at 471; see also Hankins, 84 F.3d at 802 ("[P]laintiff's refusal to accept available reasonable accommodations precludes her from arguing that other accommodations should also have been provided."). The Court therefore finds that such an accommodation was available, but Plaintiff failed to take advantage of that opportunity. Accordingly, judgment is granted of favor of Defendant as to Plaintiff's failure to accommodate claim as well.

*FMLA Interference*

As to her FMLA interference claim, Plaintiff contends that "Horseshoe interfered with [her] ability to take FMLA by repeatedly sending her home early so that she no longer qualified

---

baccarat. Finally, Gragg testified that she held an open training course in approximately 2010 for all interested employees, and Demarce has failed to cite any countervailing evidence.

for FMLA." Defendant, on the other hand, contends that Plaintiff cannot show that she was eligible for FMLA leave after July 6, 2010.

Under the FMLA, "'an eligible employee shall be entitled to a total of 12 work-weeks of leave during any 12-month period for one or more of four listed reasons, including the care of a relative with a serious health condition or because of a serious health condition of the employee." Lyons v. North East Ind. Sch. Dist., 277 F. App'x 455, 456 (5th Cir. 2008) (citing 29 U.S.C. § 2612(a)). An employee is deemed "eligible" for FMLA leave if the employee has been employed "for at least 12 months by the employer . . . and for at least 1,250 hours of service with such employer during the previous 12-month period." Id. (citing 29 U.S.C. § 207(e)(2)).

In order to establish a prima facie case of interference, Plaintiff must show that (1) she was an eligible employee, (2) her employer was subject to the FMLA's requirements, (3) she was entitled to leave, (4) she gave proper notice of her intention to take FMLA leave, and (5) her employer denied her the benefits to which she was entitled under the FMLA. Lanier v. Univ. of Tex. Sw. Med. Ctr., --F. App'x--, 2013 WL 2631316, *2 (5th Cir. Jun. 12, 2013); see also Cuellar v. Keppel Amfels, 731 F.3d 342, *-- (5th Cir. 2013) (Elrod, J., concurring) (emphasizing that the "critical inquiry . . . is whether the claim, by its nature arises from the denial of a substantive FMLA *entitlement*) (emphasis added); Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2001) ("To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied."); Crown v. Nissan N. Am. Inc., 634 F. Supp. 2d 688, 691 (S.D. Miss. 2009) (noting that "plaintiff must first demonstrate that his leave was protected under the FMLA.").

The undisputed facts before the Court show that after July 6, 2010, Demarce had not worked 1,250 hours in any preceding rolling twelve-month period and was not an eligible employee. Although Plaintiff's theory seems to be that Defendant's "interference" prevented her from becoming eligible, she has cited no authority recognizing such a theory of liability. Thus, as in Lyons, Demarce was not an eligible employee under the FMLA and cannot mount a prima facie case of FMLA interference. See 277 F. App'x at 456. As emphasized in Crown, in order to successfully bring an interference claim, the plaintiff must demonstrate that she "was entitled to a benefit that was denied." 634 F. Supp. 2d at 691 (citing Duchesne v. Shaw Group Inc., 2008 WL 4544387 *4 (W.D. La. Sept. 10, 2008)). Here, because Plaintiff was not an eligible employee, she cannot show any entitlement to FMLA leave and judgment is due in favor of Defendant as to her interference claim.

*FMLA Retaliation*

In her second amended complaint, Demarce averred that Defendant retaliated against her by terminating her "for taking necessary leave." Although Defendant has attacked Plaintiff's retaliation claim in its summary judgment motion, Plaintiff's response offered no rebuttal. Plaintiff has therefore abandoned the claim by failing to address Defendant's argument. Int'l Women's Day March Planning Comm. v. City of San Antonio, 619 F.3d 346, 356 (5th Cir. 2010) (quoting Keelan v. Majesco Software Inc., 407 F.3d 332, 340 (5th Cir. 2005) ("If a party wishes to preserve an argument for appeal, the party 'must press and not merely intimate the argument during the proceedings before the district court.'")).

*Defendant's Motion to Strike*

Defendant seeks to strike a number of evidentiary materials that, according to Defendant, contain inadmissible hearsay. Because the Court, however, determines that judgment is due in

favor of Defendant regardless of any ruling on the purported hearsay materials, the Court finds Defendant's contention moot. Additionally, however, Defendant's motion also seeks to strike Plaintiff's supplemental response submitted in response to Defendant's motion for summary judgment. According to Plaintiff, she submitted the supplemental response because Plaintiff, "through oversight, did not brief the issue of back pay" in her initial response. Notably, Plaintiff's supplemental response focused only on the issue of back pay. Because the Court has now determined that judgment is due in favor of Defendant, the Court need not reach this issue and Defendant's motion is moot as to this issue as well. Therefore, the Court finds Defendant's motion to strike moot.

### *Plaintiff's Motion to Amend or Correct*

After filing her supplemental response, Plaintiff then sought leave to amend her original response and address the issue of back pay. Again, because the Court has determined that judgment is due in favor of Defendant, the Court need not reach this issue and Plaintiff's motion is rendered moot.

### *Access to Defendant's Motion for Summary Judgment*

Finally, the Court takes the present opportunity to address an issue regarding the sealing of Defendant's Motion for Summary Judgment and a number of other evidentiary materials. Defendant previously requested leave to file its summary judgment motion and supporting materials under seal based on various confidentiality provisions of the Health Insurance Portability and Accountability Act (HIPAA). Although this Court subsequently entered an order restricting access to a number of documents filed by both Defendant and Plaintiff, review of the documents actually submitted by the parties has revealed very little sensitive information.

Under the law of this Circuit, a district court "must use caution in exercising its discretion to place records under seal" and "must balance the public's common law right of access against the interests favoring nondisclosure." United States v. Holy Land Found. For Relief & Dev., 624 F.3d 685, 689-90 (5th Cir. 2010); SEC v. Van Waeyenberghe, 990 F.2d 845, 848 (5th Cir. 1993). While there is a strong presumption that all trial proceedings be subject to public scrutiny, access can be denied upon a strong showing that the "court files might have become a vehicle for improper purposes." Van Waeyenberghe, 990 F.2d at 848. The power to restrict access, however, should be exercised "charily." Fed. Savings & Loan Ins. Corp. v. Blain, 808 F.2d 395, 399 (5th Cir. 1987).

In reviewing the portion of the record currently shielded from public inspection, the Court finds that a number of the documents  contain no sensitive information and should therefore be unsealed: Motion for Summary Judgment [54]; Exhibit B [Attachment 2 to Document 54]; Exhibit C [Attachment 3 to Document 54]; Exhibit D [Attachment 4 to Document 54]; Exhibit E [Attachment 5 to Document 54]; Exhibit F [Attachment 6 to Document 54]; Exhibit G [Attachment 7 to Document 54]; Exhibit H [Attachment 8 to Document 54]; Memorandum in Support [55]; Exhibit 2, Part 1[Attachment 1 to Document 72].  Based on the agreement of counsel that there is no reason to protect the foregoing documents, the Court hereby orders that such records no longer be restricted from public access.  The Court allows only Exhibit A [Attachment 1 to Document 54], Exhibit 2, Part 2 [Attachment 2 to Document 72], and Exhibit 2, Part 3 [Attachment 3 to Document 72] to remain filed under restricted access.

<u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion for Summary Judgment [54] is GRANTED, Defendant's Unopposed Motion for Leave to File Excess Pages [62] is GRANTED,

Defendant's Motion to Strike [63] is found MOOT, and Plaintiff's Motion to Amend or Correct [66] is also found MOOT.  Public access to the majority of the record before the Court is allowed.  Judgment being entered in favor of Defendant, this case is CLOSED.

SO ORDERED, this the 12th day of December, 2013.

**/s/ Sharion Aycock_____**
**U.S. DISTRICT JUDGE**